UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD DIXON,

                Plaintiff,

                                                  Case Number 09-14236-BC

v.                                           Honorable Thomas L. Ludington

ROSCOMMON COUNTY, JOSEPH
QUINTANA, RONALD SMITH, ALLAN
KORY, and WILLIAM TATRAI,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Ronald Dixon was traveling from Saginaw to his home in Roscommon County around 4:00 a.m. on December 21, 2007, when the van he borrowed broke down. He coasted to the side of a rural two-lane road and came to a stop partially blocking a driveway. A neighbor who believed the vehicle's location was suspicious called the Roscommon County Sheriff's Department. Four deputies responded to the call and found Plaintiff sitting in the disabled van with the lights on.

The deputies asked Plaintiff for identification; he explained he did not have any identification and provided a false name. After checking the false name in a database, the deputies determined that the person who they believed had been driving the van had a suspended driver's license. The deputies then asked Plaintiff to exit the van. Plaintiff refused. Instead, he rolled up the windows, locked the doors, produced a pipe from his pocket, and began smoking what was apparently some form of cocaine. In response, the deputies broke the van's window with a flashlight, hit Plaintiff in the back of the head, pulled him through the broken window, forced him to the ground, where he

was kneed in the face and choked, and arrested him.

On October 29, 2009, Plaintiff filed a four-count complaint against Roscommon County and the deputies, Joseph Quintana, Ronald Smith, Allan Kory, and William Tatrai, contending that excessive force was used to secure his arrest in violation of the Fourth Amendment and 42 U.S.C. § 1983. Plaintiff's complaint also asserts claims for assault and battery and gross negligence. On September 28, 2010, Defendants filed a motion for summary judgment, contending that Plaintiff lacks sufficient evidence to support his claims, that the deputies are entitled to qualified immunity, that the County cannot be liable under § 1983 because there was no "pattern or practice" of misconduct, and that Defendants are entitled to governmental immunity from Plaintiff's tort claims. Plaintiff filed a response on October 29, 2010, and Defendants filed a reply on November 11, 2010. On January 5, 2011, the hearing on Defendants' motion was canceled after the Court determined that the parties' papers provided the necessary factual and legal information to reach a decision. *See* E.D. Mich. L.R. 7.1(f). For the reasons explained below, Defendants' motion will be granted in part and denied in part.

## I

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation

omitted).  If the opposing party does not raise a genuine issue of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Id.* at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## II

On December 20, 2007, Plaintiff borrowed a green Ford Windstar van from his friend, Theresa Dean, and drove to Saginaw, Michigan to drop off Christmas presents at his mother's house.  Pl. Dep. at 101–02.  Plaintiff did not have a valid driver's license at the time.  *Id.* at 102.  As he was traveling home during the early morning hours of December 21, 2007, the van began to lose power and ultimately stalled.  *Id.*  Plaintiff steered the van to the side of the road, where it came to a stop partially blocking a driveway, and waited.  *Id.* at 105.  Although he had a cellular phone in his possession, he did not attempt to make any phone calls or secure assistance with the stalled vehicle. *Id.*  Sometime later, a police car pulled up behind the van and Deputy Quintana approached the driver's side window.  *Id.* at 109.  At the officer's request, Plaintiff turned on the ignition and rolled

down the power window. *Id.*

After greeting the officer, Plaintiff explained that the van broke down and stated, falsely, that he was waiting for the van's owner and driver, Dean, to return with help. *Id.* at 110; Video Tr. at 1.[1] Deputy Quintana then asked Plaintiff for his name and identification. Video Tr. at 2. Plaintiff responded, again falsely, that he did not have identification, that his name was "Rob A. Tracy," and that his birth date was July 11, 1970. *Id.* at 2–3. After walking around the van to look for footprints, Deputy Quintana returned to the patrol car to verify the information he had obtained from Plaintiff. *Id.* at 3. Plaintiff testified during his deposition that he was "scared" following his initial interaction with Deputy Quintana because he believed he may be arrested. Pl. Dep at 113. Plaintiff had five felony convictions on his record, an outstanding arrest warrant for what would become a sixth felony conviction, and a pipe with cocaine and marijuana residue in his possession. *Id.* at 113; Quintana Dep. at 41; Michigan Department of Corrections, Offender Tracking Information System, www.state.mi.us/mdoc/asp/otis2.html.

Deputy Quintana, for his part, was suspicious of Plaintiff's story. Quintana Dep. at 40. He believed Plaintiff was under the influence of drugs because Plaintiff's eyes were glassy and bloodshot, but Deputy Quintana could not smell alcohol. *Id.* at 32. He also believed it was unusual that Plaintiff's first name was "Rob" rather than "Robert," and that his middle name was simply "A." Plaintiff told Deputy Quintana that the initial did not stand for anything. *Id.* at 40. Finally, when Deputy Quintana looked around the van for footprints in the fresh snow, he did not find any. *Id.* The lack of footprints was inconsistent with Plaintiff's story that Dean had been driving and left the

---

[1] Plaintiff's interaction with the deputies was captured by a video camera in one of the patrol cars. The video and a transcript of the sound recording from the video are attached as exhibits to Defendants' motion for summary judgment. [Dkt. # 23-5, 23-12].

-4-

van to get help.  *Id.*  As a result of his suspicions, Deputy Quintana ran the name "Rob A. Tracy" through the LEIN database and discovered that Mr. Tracy's driver's license was suspended.  *Id.*

When Deputy Quintana returned to the van, Plaintiff was talking with Dean on his cellular phone.  Video Tr. at 4–5.  Deputy Quintana asked to speak with Dean several times.  *Id.*  Plaintiff initially refused, but ultimately permitted Deputy Quintana to use the phone.  *Id.* at 5–7.  Dean told Deputy Quintana that Plaintiff was using the van with her permission, but that she had not been traveling with Plaintiff that evening.  *Id.*  Deputy Quintana informed Dean that Plaintiff was likely to be arrested for driving with a suspended license and that her van would be towed.  *Id.*

Deputy Quintana then turned back to the van and discovered that Plaintiff had locked the doors and was attempting to roll up the windows.  *Id.* at 8.  The deputy inserted his hands into the window in an attempt to force it back down or break it.  Quintana Dep. at 48.  The following exchange then occurred:

| | |
|---|---|
| Police: | Hey Rob? |
| Police: | He don't want to talk anymore. |
| Police: | Open the, open it up man.  Open it up. |
| [Plaintiff]: | What? |
| Police: | Open the door.  Open the door. |
| [Plaintiff]: | I'm not opening the door. |
| Police: | Okay.  Well let, listen, right now you are under arrest okay. |
| [Plaintiff]: | For what? |
| Police: | So if you don't open it we're gonna break this window out and I'm gonna rip you out of the car.  So I would suggest you open the door and get out. |

[Plaintiff]:        What am I under arrest for?

Police:            For driving with a suspended license.

[Plaintiff]:        I'm not driving.  The vehicle broke down –

Video Tr. at 8.  At that point, Plaintiff testified that he was "scared" because he "knew [what] was

going to come" and hoped to avoid it.  Pl. Dep. at 114.  Plaintiff did not open the door "[b]ecause

as soon as he told me he was going to rip me out, I knew what was probably going to happen."  *Id.*

Plaintiff then produced a pipe, which contained a cocaine-based substance and marijuana

residue, and began smoking.  *Id.*  The deputies believed Plaintiff was smoking marijuana.  Video

Tr. at 8.  Deputy Quintana then called for help from Deputies Smith and Tatrai, while Deputy Kory

broke the van's window with a flashlight.  *Id.*  Deputies Quintana, Smith, and Kory then reached into

the van, struck Plaintiff twice in the back of the head, pulled him out of the van through the broken

glass, "threw" Plaintiff to the ground, and forcibly held him there.  *Id.*; Pl. Dep at 118.  The deputies

placed their knees into Plaintiff's back and choked him, causing a momentary loss of consciousness

while Plaintiff was on the ground.  Pl. Dep. 119–22, 145.  Plaintiff was also kneed in the face by

officer Kory.  *Id.* at 122–23.  The video records the exchange:

Police:            And I can smell marijuana.  Thirteen hop up.  Come on up here.  He's
                   not getting out for us.  You're gonna get out of the car.  He's smoking
                   – get out of the car now.  Get out of the car!

[Plaintiff]:        Man, damn, alright, alright, alright.

Police:            You're lighting up and smoking dope right in front of us.  Put your
                   hands behind your back.

[Plaintiff]:        (screaming)

Police:            Put your hands behind your back.

-6-

[Plaintiff]:      (screaming)

Police:           Rob, put your hands behind your back.

[Plaintiff]:      (screaming)

Police:           Put your hands behind your back.  You trying to roll over me?
                  You're not doing it though are you?  Get on your stomach Rob now!

Police:           Come on man.

Police:           Roll over.

[Plaintiff]:      Fuck you.

Police:           Rob, roll over.

[Plaintiff]:      Alright, well stop alright.

Police:           Let him roll, let him roll.

[Plaintiff]:      Alright.

Police:           Alright, get on your stomach Rob.

[Plaintiff]:      I got glass in my face.

Police:           Well why is that?

Police:           Roll to your stomach.

Police:           Roll over on your stomach.

Police:           Watch for traffic.  I'm gonna get my cuffs.

Police:           You wanna play some more?  Huh?  You want to play some more?
                  You like playing with the police?

Video Tr. 8–10.  Plaintiff testified that he was unable to comply with the deputies' repeated requests

to roll over and place his arms behind his back because they were on top of him, pinning him to the

ground, and he was unable to move.  Pl. Dep at 123–24, 148.

Plaintiff was ultimately handcuffed and placed in a patrol car. He was transported to the county jail, where his true identity was discovered with the assistance of a state identification card in his wallet. According to the attorney who was appointed to represent him, John Rosczyk, Plaintiff was charged with several crimes arising from the incident. Rosczyk Dep. at 11–12. Plaintiff entered a no contest plea to resisting and obstructing a police officer and a guilty plea to driving with a suspended license. *Id.* The remaining charges were dismissed.

### III

Plaintiff contends in his complaint that his treatment by the deputies constitutes assault and battery in violation of Michigan law (Count I), excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983 (Count II), and gross negligence in violation of Michigan law (Count III). Plaintiff further contends that Roscommon County should be held responsible for the deputies' infringement of his rights because the County deliberately chose not to supervisor its officers, which led to systematic and continuous civil rights violations (Count IV). *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002).

### A

The deputies contend they are entitled to summary judgment on Plaintiff's excessive force claim because they did not use excessive force to secure Plaintiff's arrest and they are entitled to qualified immunity.[2] Generally, summary judgment based on qualified immunity is proper if the law did not put the officer on notice that his conduct would be clearly unlawful. *Higgason v.*

---

[2] The merits of the underlying excessive force claim are relevant to whether or not the deputies are entitled to qualified immunity. Accordingly, both issues will be addressed together.

*Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper. *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988).

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity is immunity from suit, not merely a defense to liability. *See id.* at 200–01 (emphasis in original). "Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

At the summary judgment phase, whether a defendant is entitled to qualified immunity depends on a two-step inquiry: first, whether the violation of a constitutional right has occurred, and second, whether the right at issue "was clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citations and quotation marks omitted); *see also Pearson v. Callahan*, 555 U.S. 223, (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

To be clearly established, "[t]he contours of the right must be sufficiently clear that a

-9-

reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted); *see also Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). "This standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997) (quotations marks and citation omitted, alteration in original).

Generally, there are two ways in which a plaintiff may show that "officers were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care . . . the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, the violation may be shown "by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case." *Id.* (quoting *Brousseau*, 543 U.S. at 201).

**1**

Defendants first contend that even when viewed in the light most favorable to Plaintiff, the evidence does not demonstrate that a constitutional violation has occurred. *Champion*, 380 F.3d at 901. Defendants contend that the force used to secure Plaintiff's arrest was objectively reasonable

"when viewed from the prospective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007); *see also* U.S. Const. Amend. IV (guaranteeing people in the United States the right "to be secure in their persons . . . against unreasonable searches and seizures"); *Graham v. Connor*, 490 U.S. 386, 394–96 (1989) (describing the "objective reasonableness" standard for reviewing Fourth Amendment claims). Plaintiff responds that the deputies used unreasonable force when they struck him in the back of the head with a flashlight and fist, choked him, and kneed him in the face and the back.[3]

"An officer making an investigative stop or arrest has 'the right to use some degree of physical coercion or threat thereof to effect it.' " *Fox*, 489 F.3d at 236 (quoting *Graham*, 490 U.S. at 395–96). Whether the force used is reasonable under the circumstances depends on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "[T]he definition of reasonable force is partially dependent on the demeanor of the suspect." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (citation and quotation marks omitted).

A material issue of fact exists as to whether the deputies used excessive force to secure Plaintiff's arrest. At the time the deputies initiated the arrest, Plaintiff was suspected of driving without a license, driving under the influence of controlled substances, and possessing a controlled substance, all of which are largely status offenses that under the circumstances did not pose any immediate risk to the general public. More importantly, there was no immediate threat to the safety of the officers. Although Plaintiff was resisting arrest by rolling up the van windows and locking

---

[3] Each alleged use of force will be considered separately. *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004).

the doors, his resistence was passive rather than active.  *See Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681 (6th Cir. 2006) (concluding use of "gratuitous violence" to secure a suspect's arrest is not justified even where the suspect resisted arrest by refusing to open the door to her home and "hiding" in a bedroom closet under a blanket).  Plaintiff refused to cooperate with the deputies, but he did not aggressively act against them or provide any basis for a reasonable belief that the deputies were in danger.[4]  Accordingly, if, as Plaintiff contends and the Court must presume at this stage of the case, he was struck in the back of the head with a flashlight, choked, and kneed in the back and the face by the deputies, the level of force they chose to employ was, at least, close to the limit imposed by the Constitution.

Defendants cite several cases where the Sixth Circuit granted summary judgment to defendant police officers on excessive force claims after concluding that the amount of force used was reasonable as a matter of law.  In *Schliewe v. Toro*, 138 F. App'x 715 (6th Cir. 2005), the plaintiff was arrested for being a disorderly person in violation of Michigan law and transported to the police station.  *Id.* at 721.  Once there, the plaintiff attempted to escape by running from a holding area at the jail toward an open door leading to the "communications room."  *Id.* at 721–22.  The defendant police officer responded by punching the plaintiff in the face, breaking his jaw.  *Id.* The Sixth Circuit concluded that the punch was reasonable because the plaintiff was intoxicated, acting erratically, and actively attempting to escape from custody.  *Id.*  Moreover, the defendant police officer reacted instinctively to a situation he had never before encountered.  *Id.*

Similarly, in *Thacker v. Lawrence County*, 182 F. App'x 464 (6th Cir. 2006), two police

---

[4] According to the police report, Plaintiff is five feet nine inches tall and weighs 150 pounds.  The deputies on the video appear to be considerably larger and physically stronger.

officers were called to the scene of a fire after the firefighters reported that there was a man with a gun at the scene. *Id.* at 466–68. The officers abruptly removed the gun from the man's hands, at which point he became angry and aggressive, cursing at the officers for taking his gun rather than investigating the fire. *Id.* The officers then reached for the man and all three fell to the ground, at which point a brief altercation ensued. *Id.* The man was then handcuffed, arrested, and pushed into the police car, sustaining an injury to his forearm. *Id.* The Sixth Circuit determined that the force used by the officers to remove the gun, wrestle the man to the ground, and push him into the police car was reasonable as a matter of law. *Id.* at 471–72. The Court emphasized the chaotic atmosphere created by the fire, that the plaintiff possessed a gun, and that the plaintiff admitted to becoming angry, cursing at the officers, and resisting their attempts to arrest him after the three men fell to the ground. *Id.*

Here, although Plaintiff was under the influence of narcotics and acting erratically, he was not attempting to escape or forcibly resist the officers, he had not demonstrated any propensity toward violent or aggressive conduct, he did not possess a weapon, and the deputies do not contend they were facing a chaotic, new, or even unusual situation. Indeed, it appears that the deputies' initial use of force against Plaintiff was triggered by their belief that he was smoking marijuana, an activity that, while illegal, does not itself pose any immediate risk to the safety of the officers or even Plaintiff.

Still, some degree of force was certainly reasonable in light of the circumstances: the deputies had probable cause to believe Plaintiff was driving under the influence of narcotics without a valid driver's license and Plaintiff was refusing the deputies' command to exit the van. *See Lee v. Hefner*, 136 F. App'x 807, 812–13 (6th Cir. 2005) (concluding it is reasonable as a matter of law

to force suspect to ground, place knee in his back, apply a wrist lock, and handcuff the suspect where the officer reasonably believes the suspect committed a crime and is fleeing from custody); *Anderson v. Antal*, 191 F.3d 451 (6th Cir. 1999) (table) (concluding it was reasonable for police officer to use some force to remove a suspected drunken driver from her vehicle after the driver initially refused to stop her vehicle and then refused the officer's command to exit the vehicle). Moreover, Plaintiff was acting erratically, he was admittedly under the influence of narcotics, and by locking the doors to the van and refusing to get out, he had created a situation with the potential to rapidly escalate.

Accordingly, the force used by the deputies to regain control of the situation and limit the uncertainty and potential for escalation created by Plaintiff's actions was objectively reasonable.[5] But given the nonviolent character of Plaintiff's crimes, the lack of imminent danger to the deputies, the public, or the plaintiff, and the lack of any indication that Plaintiff intended to flee, the alleged use of "gratuitous violence" after Plaintiff had been removed from the van and the deputies had regained control of the situation was not objectively reasonable. *Cf. Shreve*, 453 F.3d 687–88. At least with respect to the alleged choking and continued blows to the face and back that occurred after the deputies had gained control, the standard of review requires the Court to conclude that a constitutional violation may have occurred.

Defendants also contend that the video evidence directly contradicts Plaintiff's deposition testimony. According to Defendants, the video demonstrates that Plaintiff was not hit in the back of the head, choked, or kneed in the face and back. *See Scott v. Harris*, 550 U.S. 372, 380 (2007)

---

[5] Notably, Plaintiff does not contend the breaking the window, forcibly removing him from the van, and forcing him to the ground on top of the broken glass were objectively unreasonable uses of force by the deputies.

-14-

("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Contrary to Defendants' assertion, however, the video does not conclusively establish that Plaintiff was not hit, choked, or kneed by the deputies.

Plaintiff asserts that he was hit in the back of the head twice before he was pulled from the van. The events that took place while Plaintiff remained in the van are not depicted in the video, and thus, the video does not corroborate either party's version of the events. The van was parked quartering away from the camera such that the rear side and passenger's side of the van are visible but the front side and driver's side of the van, where Plaintiff was sitting, are not. Moreover, the events that took place after Plaintiff was pulled from the van are largely obscured by the deputies. All four deputies were on top of Plaintiff after he was removed from the van and his head and upper body, which were furthest from the camera, were obscured by the deputies bodies. Accordingly, while the video does not conclusively establish that Plaintiff was kneed in the head and choked by the deputies, it also does not conclusively establish that the deputies did not knee or choke Plaintiff.

## 2

Having concluded that a reasonable jury could determine that the deputies use of force after he was removed from the vehicle and subdued was objectively unreasonable under the Fourth Amendment, the next question is "whether the alleged violations involved a constitutional right that was clearly established at the time of the alleged misconduct." *Grawey*, 567 F.3d at 313. "[T]he right to be free from excessive force is a clearly established Fourth Amendment right." *Champion*, 380 F.3d at 902. But to demonstrate that the deputies are not entitled to qualified immunity, Plaintiff

-15-

must move beyond broad legal principles and "show the prior articulation of a prohibition against the type of excess force exerted here." *Id.* That is, the right is clearly established only if the officer had notice that a particular use of force in a particular situation was unconstitutional. *Baker v. City of Hamilton*, 471 F.3d 601, 605–06 (6th Cir. 2006). Each allegedly excessive use of force identified by Plaintiff will be considered in turn.

Plaintiff first contends that striking him in the head while he remained in the van violated a clearly established right. As already discussed, however, the alleged blows that occurred while Plaintiff remained in the van were an objectively reasonable use of force in the situation. Moreover, Plaintiff has not identified a specific case where the Sixth Circuit, or any Court for that matter, has concluded that striking a suspect who is resisting arrest violates the Fourth Amendment. By contrast, Defendants have identified at least one case where the Sixth Circuit concluded that a severe blow delivered by an officer to a suspect was justified under the circumstances. *See Schliewe*, 138 F. App'x 715. As already discussed, *Schliewe* can be distinguished from this case based on the suspect's aggressive and potentially violent resistence compared to Plaintiff's passive resistence. Schliewe attempted to flee from a jail holding area into a control room, while Plaintiff simply locked the car doors and refused to get out.

Nevertheless, although Plaintiff did not pose any imminent risk to the safety of the deputies or the public, he had violated the law, he was attempting to avoid arrest, and he had created a situation with the potential for rapid escalation. "Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier*, 533

U.S. at 205. "If an officer reasonablely, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.* Here, the deputies are entitled to qualified immunity with regard to the initial blows to the head delivered while Plaintiff remained in the van because they reasonably believed the blows were necessary to gain control of the situation and to avoid danger to themselves and the general public.

Next, after Plaintiff was removed from the van, he was allegedly kneed in the face and the back by the deputies as they attempted to secure his arrest.[6]  Again, Plaintiff was not engaged in violent conduct and did not pose an immediate risk of harm to the deputies, but he had created a chaotic and emotionally charged situation by smoking a mixture of marijuana and cocaine in the deputies presence and refusing to comply with the deputies' commands.  Accordingly, they reasonably believed that a substantial amount of force was justified to regain control of the situation and subdue Plaintiff.  The deputies are entitled to qualified immunity with respect to any blows that were delivered before Plaintiff was completely subdued, including the alleged knee to the face and back that occurred between 5:12:00 and 5:12:10 on the video.

The final use of force identified by Plaintiff as excessive occurred after Plaintiff was face down on the pavement with all four deputies on top of him.  At that point, one of the deputies reached down and placed his forearm under Plaintiff's chin, then lifted upward, choking Plaintiff and causing a temporary loss of consciousness.[7]  At the time the choking allegedly occurred, one of the deputies can be heard asking Plaintiff "You wanna fight some more? Huh? You wanna fight

---

[6] Plaintiff testified that the second set of blows occurred between 5:12:00 and 5:12:10 on the video.

[7] Plaintiff asserts that he was choked between 5:12:40 and 5:12:46 on the video.

some more?"  Plaintiff is moaning and mumbling incoherently.

The Sixth Circuit has repeatedly held that violent acts directed at suspects after they have been subdued and are no longer resisting arrest violate the Fourth Amendment.  *See Grawey*, 567 F.3d at 314; *Shreve*, 453 F.3d 687–88; *Champion*, 380 F.3d at 905; *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988).  In *Shreve*, the plaintiff was beaten by police while lying on the ground after she resisted arrest by refusing to open the door to her home, hiding in a closet, and refusing to produce her hands for cuffing.  453 F.3d at 687–88.  The Sixth Circuit concluded that such acts of "gratuitous violence" perpetrated by police officers during an arrest violate clearly established constitutional rights.  *Id.*  In *Grawey*, the plaintiff was pepper sprayed until he lost consciousness after he had submitted to police authority and was standing against a wall with his hands above his head.  567 F.3d at 314.  Here, applying the appropriate standard of review, it must be concluded that at the time Plaintiff was allegedly choked, he was lying face down on the ground with four officers on top of him.  Plaintiff did not, on those facts, pose a threat, as he suggests he was attempting to produce his hands to be cuffed.  Such a use of force, if Plaintiff's facts are true, a proposition we must respect given the standard of review, violates a clearly established constitutional right.

**B**

Defendants next contend that Plaintiff's constitutional claims against Roscommon County should be dismissed because a county policy was not the "moving force" behind the alleged constitutional violation.  *See Monell*, 436 U.S. at 694.  "[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy."  *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quotations and citations omitted).  Generally, the municipality will

-18-

not be liable where the challenged action is taken only once. *See Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397 (1997); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (per curiam). But "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Plaintiff contends that Roscommon County should be liable for the actions of its officers because it did not properly supervise the officers. Plaintiff emphasizes that none of the officers involved ever received a formal performance evaluation. "[L]ocal government liability can be found in instances where a serious failure to supervise employees amounts to deliberate indifference to the rights of persons with whom the employees come into contact." *Kammeyer v. City of Sharonville*, No. 1:01-CV-00649, 2006 U.S. Dist. LEXIS 24058, at *33 (S.D. Ohio Apr. 26, 2006) (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1989)). "When attempting to attach liability through a failure to train or supervise theory, it must be shown that the failure was a 'deliberate' or 'conscious' choice by the municipality." *Id.* at *33–34 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

In *Kammeyer*, a district court in Ohio refused to grant summary judgment to a municipality on an excessive force claim because the officer involved had never received a performance evaluation in more than thirty years on the job even though he had been the subject of frequent complaints. *Id.* at *34–35. The district court concluded that the complaints should have put the municipality on notice of the need to supervise the officer more closely, and the municipality's refusal to do so could constitute deliberate indifference. *Id.* In this case, by contrast, Plaintiff does not contend that the officers involved had ever been the subject of a citizen complaint, nor that the

officers involved had engaged in similar conduct in the past. Accordingly, even though the deputies did not receive formal performance evaluations, the county did not act with deliberate indifference because it had no reason to suspect that the deputies were engaged in misconduct. The *Monell* claim against the county will be dismissed.

## C

Defendants next contend that Plaintiff's assault and battery claim should be dismissed because the force exerted by the officers was reasonable under the circumstances and therefore not battery. *See Young v. Barker*, 405 N.W.2d 395 (Mich. Ct. App. 1997); *Brewer v. Perrin*, 349 N.W.2d 198 (1984). However, as discussed above, a reasonable jury could conclude that the level of force used by the deputies was excessive. In such circumstances, a police officer can be held liable for assault and battery. *Young*, 405 N.W.2d 395.

The deputies also contend that they are entitled to immunity from liability on the assault and battery claim pursuant to the Michigan Governmental Tort Liability Act. Mich. Comp. Laws § 691.1407(2); *Odom v. Wayne Cnty.*, 760 N.W.2d 217 (2008). Under Michigan law, a police officer is entitled to governmental immunity for his intentional torts if the officer can establish that "he was acting in the course of his employment and at least reasonably believed that he was acting within the scope of his authority, that his actions were discretionary in nature, and that he acted in good faith." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254 (6th Cir. 2010). "Good faith" means "without malice." *Id.*

At least with respect to the choking incident alleged by the Plaintiff, a reasonable jury could conclude that the deputies employed an unreasonable degree of force and violated a clearly established constitutional right. In such a circumstance they could not have reasonably believed

-20-

they were acting in good faith.  *See VanVorous v. Burnmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004) (suggesting that a police officer can be liable for intentional torts under Michigan law if his conduct is "objectively unreasonable" under the Fourth Amendment standard); *see also Miller*, 606 F.3d at 254 (noting that the objectively unreasonable standard applied in an excessive force case is analogous to the good faith standard applied under Michigan law).  Accordingly, the assault and battery claims against the deputies will not be dismissed

### D

Defendants next contend that Plaintiff's gross negligence claim should be dismissed because it is an attempt to avoid the governmental immunity statute by "transforming" an intentional tort claim into a gross negligence claim.  Indeed, such a strategy has been repeatedly rejected by the Michigan state courts, *see, e.g.*, *VanVorous*, 687 N.W.2d at 143, the Sixth Circuit, *see, e.g.*, *Miller*, 606 F.3d at 254, and this Court, *Scozzari v. City of Clare*, 723 F. Supp. 2d 945, 967–68 (E.D. Mich. 2010).  Plaintiff's tort claims are premised not on any breach of the duty of care by the deputies, but on their alleged intentional misconduct.  Accordingly, the gross negligence claim will be dismissed.

### IV

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment [Dkt. # 23] is **GRANTED IN PART AND DENIED IN PART**.  A material issue of fact precludes summary judgment on the excessive force claim, at least with respect to the alleged choking.  Similarly, the deputies are not entitled to summary judgment on Plaintiff's assault and battery claim.  The *Monell* claim against the County and the gross negligence claims, however, must be dismissed.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 25, 2011

-21-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 25, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS