UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD DIXON,

     Plaintiff,

                Case Number 09-14236
v.                 Honorable Thomas L. Ludington

ROSCOMMON COUNTY et al.,

     Defendants.
_____ /

**OPINION AND ORDER DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    Is six seconds enough time for three police officers kneeling on top of a suspect to stop a fourth from choking the suspect?  Put more precisely, could a reasonable person could conclude that it was enough time?  That is the question in this case.

    Plaintiff Ronald Dixon has brought suit against four officers — Deputies Joseph Quintana, Ronald Smith, and Allan Kory, and Sergeant William Tatrai — alleging that the officers violated Plaintiff's civil rights by using excessive force in arresting him.  The three deputies move for summary judgment, contending that because "the alleged choking incident happened in a matter of seconds . . . Defendants had no realistic opportunity to intervene and prevent [Sergeant Tatrai's] alleged choking of Plaintiff."

    Contrary to the deputies' contention, a reasonable person could conclude that there was sufficient time for the deputies to intervene on Plaintiff's behalf.  The deputies had enough time for one of them to say to Plaintiff as he was being choked "You wanna play some more?  Huh?  You want to play some more?  You like playing with the police?"  It will thus be up to the jury to

decide whether they had time to tell Sergeant Tatrai to stop and to act to stop him.  The deputies are not entitled to summary judgment on Plaintiff's excessive force claim.

## I

## A

On December 20, 2007, Plaintiff borrowed a green Ford Windstar van from his friend, Theresa Dean, and drove to Saginaw, Michigan to drop off Christmas presents at his mother's house.  Pl. Dep. at 101–02, Aug. 5, 2010, *attached as* Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. A, ECF No. 30-2.  Plaintiff did not have a valid driver's license at the time.  *Id.* at 102.  As he was traveling home during the early morning hours of December 21, 2007, the van lost power and stalled.  *Id.*  Plaintiff steered the van to the side of the road, where it came to a stop partially blocking a driveway.  *Id.* at 105.  Although he had a cellular phone in his possession, Plaintiff did not attempt to make any phone calls or secure assistance with the stalled vehicle.  *Id.*  Rather, he sat and waited.  *Id.*

Sometime later, a police car pulled up behind the stalled van and Deputy Quintana approached the driver's side window.  *Id.* at 109.  At the officer's request, Plaintiff rolled down the window.  *Id.*  After greeting Deputy Quintana, Plaintiff explained that the van broke down and stated, falsely, that the van's owner, Ms. Dean, had been driving and had left to go get help.  *Id.* at 110; Video Tr. at 1, *attached as* Defs.' Mot. Summ. J. Exs. 4, 11, ECF Nos. 23-5, 23-12.[1]

Deputy Quintana asked Plaintiff for his name and identification.  Video Tr. at 2.  Plaintiff responded, again falsely, that he did not have identification and that his name was "Rob A. Tracy."  *Id.* at 2–3.  Asked what the "A" stood for, Plaintiff told Deputy Quintana that the initial did not stand for anything.  Quintana Dep. at 40, Aug. 4, 2010, *attached as* Def.'s Mot. Ex. 2.

---

[1] Plaintiff's interaction with the deputies was captured by a video camera in one of the patrol cars.  The video and a transcript of the sound recording from the video are attached as exhibits to Defendants' first motion for summary judgment.  ECF Nos. 23-5, 23-12.

Deputy Quintana was suspicious of Plaintiff's story.  *Id.* at 40.  He believed Plaintiff was under the influence of drugs because Plaintiff's eyes were glassy and bloodshot, but Deputy Quintana could not smell alcohol.  *Id.* at 32.  He also believed it was unusual that Plaintiff's first name was "Rob" rather than "Robert," and that his middle name was simply "A."

Walking around the van to look for Ms. Dean's footprints in the fresh snow, Deputy Quintana did not see any.  *Id.*  The lack of footprints was inconsistent with Plaintiff's story that Dean had been driving and left the van to get help.  *Id.*  Deputy Quintana then returned to the patrol car to check the identification information he had obtained from Plaintiff.  Video Tr. at 3.

Plaintiff testified during his deposition that he was "scared" following his initial interaction with Deputy Quintana because he believed he may be arrested.  Pl. Dep. at 113.  Plaintiff had five felony convictions on his record, an outstanding arrest warrant for what would become a sixth felony conviction, and a pipe with cocaine and marijuana residue in his possession.  *Id.* at 113; Quintana Dep. at 41.

Deputy Quintana ran the name "Rob A. Tracy" through the LEIN database and discovered that Mr. Tracy's driver's license was suspended.  *Id.*  When Deputy Quintana returned to the van, Plaintiff was talking with Ms. Dean on Plaintiff's cellular phone.  Video Tr. at 4–5.  Deputy Quintana asked to speak with Ms. Dean several times.  *Id.*  Plaintiff initially refused, but ultimately permitted Deputy Quintana to use the phone.  *Id.* at 5–7.  Ms. Dean told Deputy Quintana that Plaintiff was using the van with her permission, but that she had not been traveling with Plaintiff that evening.  *Id.*  Deputy Quintana informed Dean that Plaintiff was likely to be arrested for driving with a suspended license and that her van would be towed.  *Id.*

Deputy Quintana then turned back to the van and discovered that Plaintiff had locked the doors and was attempting to roll up the windows.  *Id.* at 8.  The deputy inserted his hands into

the window in an attempt to force it back down or break it.  Quintana Dep. at 48.  The attempt

was not successful, and Plaintiff rolled up the windows.   About this time, Deputies Quintana,

Smith, and Kory, and Sergeant Tatrai had the following exchange:

| | |
|---|---|
| Police: | [Ms. Dean] knows that guy? |
| Police: | Yeah. . . . |
| Police: | Yeah, okay.  He's saying she was with him? |
| Police: | Yeah.  He's just trying to cover his butt you know. |
| Police: | (inaudible) |
| Police: | No, he was in the driver's seat.  He said oh I hopped over when she left. |
| Police: | He's, are you gonna fuck with him now? |

Video Tr. at 8.  At that point, Plaintiff again testified that he was "scared," explaining he "knew

[what] was going to come."  Pl. Dep. at 114.  Addressing Plaintiff, one of the officers called out:

| | |
|---|---|
| Police: | Hey Rob? |
| Police: | He don't want to talk anymore. |
| Police: | Open the, open it up man.  Open it up. |
| [Plaintiff]: | What? |
| Police: | Open the door.  Open the door. |
| [Plaintiff]: | I'm not opening the door. |
| Police: | Okay.  Well let, listen, right now you are under arrest okay. |
| [Plaintiff]: | For what? |
| Police: | So if you don't open it we're gonna break this window out and I'm gonna rip you out of the car.  So I would suggest you open the door and get out. |
| [Plaintiff]: | What am I under arrest for? |

Police:          For driving with a suspended license.

[Plaintiff]:     I'm not driving.  The vehicle broke down —

Video Tr. at 8.  Plaintiff did not open the door, he later explained in his deposition, "[b]ecause as

soon as he told me he was going to rip me out, I knew what was probably going to happen."  Pl.

Dep. at 114.

Instead, Plaintiff took out pipe that contained a cocaine-based substance and marijuana

residue and began smoking.  *Id.*  The deputies smelled the marijuana.  Video Tr. at 8.  Deputy

Kory broke the van's window with a flashlight.  *Id.*  Deputies Quintana, Smith, and Kory reached

into the van, struck Plaintiff twice in the back of the head, pulled him out of the van through the

broken glass, threw Plaintiff to the ground, and forcibly held him there.  *Id.*; Pl. Dep. at 118.  As

this was transpiring, the transcript from video recounts the following exchange:

Police:          And I can smell marijuana.  Thirteen hop up.  Come on up here.
                 He's not getting out for us.  You're gonna get out of the car.  He's
                 smoking – get out of the car now.  Get out of the car!

[Plaintiff]:     Man, damn, alright, alright, alright.

Police:          You're lighting up and smoking dope right in front of us.  Put your
                 hands behind your back.

[Plaintiff]:     (screaming)

Police:          Put your hands behind your back.

[Plaintiff]:     (screaming)

Police:          Rob, put your hands behind your back.

[Plaintiff]:     (screaming)

Police:          Put your hands behind your back.  You trying to roll over me?
                 You're not doing it though are you?  Get on your stomach Rob
                 now!

Police:        Come on man.

Police:        Roll over.

[Plaintiff]:   Fuck you.

Police:        Rob, roll over.

[Plaintiff]:   Alright, well stop alright.

Police:        Let him roll, let him roll.

[Plaintiff]:   Alright.

Police:        Alright, get on your stomach Rob.

[Plaintiff]:   I got glass in my face.

Police:        Well why is that?

Police:        Roll to your stomach.

Police:        Roll over on your stomach.

Police:        Watch for traffic.  I'm gonna get my cuffs.

Video Tr. 8–9.  As Plaintiff was face down on the pavement with all four officers on top of him, Sergeant Tatrai began choking Plaintiff.  Pl. Dep. 119–22, 145.  The choking lasted about six seconds. (It occurred between 5:12:40 and 5:12:46 on the video.)  At the time of the choking, the deputies had each placed their knees into Plaintiff's back and Deputy Kory kneed Plaintiff in the face.  Pl. Dep. 119–23, 145.[2]

---

[2] Although the incident was recorded, the events that took place after Plaintiff was pulled from the van are largely obscured by the deputies.  All four deputies were on top of Plaintiff after he was removed from the van and his head and upper body, which were furthest from the camera, were obscured by the deputies bodies.  Accordingly, while the video does not conclusively establish that Plaintiff was kneed in the head and choked by the deputies, it also does not conclusively establish that the deputies did not knee or choke Plaintiff.  On Defendants' motion for summary judgment, of course, all reasonable factual inferences must be drawn in Plaintiff's favor.

As this was transpiring, one of the deputies can be heard on the video asking Plaintiff: "You wanna play some more?  Huh?  You want to play some more?  You like playing with the police?"  Video Tr. at 9.  Specifically, the video records the following exchange:

| | |
|---|---|
| Police: | You wanna play some more?  Huh?  You want to play some more?  You like playing with the police? |
| Police: | Okay, I got one cuff on him.  I need his other arm. |
| [Plaintiff]: | (inaudible) |
| Police: | Are you sure about that? |
| Police: | Roll him over to his stomach.  You guys I need his other arm, Bill, if you can get it out. |
| Police: | You done playing? |
| [Plaintiff]: | Yeah. |
| Police: | Huh? |
| [Plaintiff]: | Yeah. |
| Police: | You sure about that? |
| Police: | Rob, give us your left arm. |
| [Plaintiff]: | (grunting) |
| Police: | Put the arm out, your right arm out now. |
| Police: | Put your arm out. |
| Police: | Come on stupid, let's go. |
| [Plaintiff]: | (grunting) |
| Police: | Let's go Rob, give me your arm.  Give me your arm.  You don't have any weapons on you, do you? |
| [Plaintiff]: | No. |
| Police: | Let go.  Let go of your hand.  Let go of your hand! |

[Plaintiff]:        (inaudible)

Police:          Alright, he's in custody.

*Id*. at 9–10.  Plaintiff testified that he was unable to comply with the deputies' requests to roll over and place his arms behind his back because they were on top of him pinning him to the ground and he was unable to move (indeed, he was briefly rendered unconscious).  Pl. Dep. at 123–24, 148.

Plaintiff was ultimately placed in a patrol car and transported to the county jail, where his identity was discovered with the assistance of a state identification card in his wallet.  According to the attorney who was later appointed to represent him, John Rosczyk, Plaintiff was charged with several crimes arising from the incident.  Rosczyk Dep. at 11–12, Aug. 4, 2010, *attached as* Defs.' Mot. Ex. 7.  Plaintiff entered a no contest plea to resisting and obstructing a police officer and a guilty plea to driving with a suspended license.  *Id.*  The remaining charges were dismissed.

**B**

On October 29, 2009, Plaintiff filed a four-count complaint against Roscommon County and the four officers.  The complaint asserts that Plaintiff's treatment by the officers constitutes assault and battery in violation of Michigan law (Count I), excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983 (Count II), and gross negligence in violation of Michigan law (Count III).  Plaintiff further contends that Roscommon County should be held responsible for the officers' infringement of his rights because the county deliberately chose not to supervisor its officers, which led to systematic and continuous civil rights violations (Count IV).  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Defendants moved for summary judgment on September 28, 2010, contending that Plaintiff lacks sufficient evidence to support his claims, the deputies are entitled to qualified immunity, the county cannot be liable under § 1983 because there was no "pattern or practice" of misconduct, and Defendants are entitled to governmental immunity from Plaintiff's tort claims.

This Court granted in part and denied in part Defendants' motion. *Dixon v. Cnty. of Roscommon*, No. 09–14236, 2011 WL 281042 (E.D. Mich. Jan. 25, 2011), *aff'd* No. 11-1127, 2012 WL 1522320 (6th Cir. May 2, 2012) (per curiam). Specifically, this Court denied the motion for summary judgment on the assault and battery and § 1983 claims because a material issue of fact exists as to whether the deputies used excessive force. Although Plaintiff was resisting arrest by rolling up the van windows and locking the doors, his resistance was passive rather than active. *See Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681 (6th Cir. 2006) (concluding use of "gratuitous violence" to secure a suspect's arrest is not justified even where the suspect resisted arrest by refusing to open the door to her home and "hiding" in a bedroom closet under a blanket). Plaintiff refused to cooperate with the officers, but he did not aggressively act against them or provide any basis for a reasonable belief that he posed a danger.[3] Given the lack of imminent danger to the officers and public and the lack of any indication that Plaintiff intended to flee, the alleged use of "gratuitous violence" after Plaintiff had been removed from the van and the officers had gained control of the situation was not objectively reasonable.

The Court granted Defendants summary judgment on the *Monell* and gross negligence claims. The Court explained that the *Monell* claim must be dismissed because Plaintiff did not contend that the officers involved had ever been the subject of a citizen complaint, nor that the

---

[3] According to the police report, Plaintiff is five feet nine inches tall and weighs 150 pounds. The deputies on the video appear to be considerably larger and physically stronger.

officers involved had engaged in similar conduct in the past.  Accordingly, the county did not act with deliberate indifference because it had no reason to suspect that the deputies were engaged in misconduct.  The Court further explained that the gross negligence claim must be dismissed because it is not premised on any breach of the duty of care by the deputies, but on their alleged intentional misconduct.

Defendants then took an interlocutory appeal to the Sixth Circuit, which affirmed the judgment of this Court.  *Dixon v. Cnty. of Roscommon*, No. 11-1127, 2012 WL 1522320 (6th Cir. May 2, 2012) (per curiam).  In affirming, the court observed in passing that "Defendants Quintana, Smith, and Kory also argue that they are entitled to qualified immunity because they did not personally participate in the alleged choking and did not have a realistic opportunity to prevent it.  Although this may present a close issue, it is one the defendants did not raise before the district court . . . .  [W]e decline to reach this issue on appeal."  *Id*. at 3.

On June 9, 2012, Defendants Quintana, Smith, and Kory (collectively, the "Deputies") filed a second motion for summary judgment.  ECF No. 56.  After noting the above passage from the Sixth Circuit's opinion, the Deputies assert that because "the alleged choking incident happened in a matter of seconds . . . Defendants had no realistic opportunity to intervene and prevent the alleged choking of Plaintiff.  Therefore, Defendants Quintana, Smith and Kory are not liable as a matter of law and should be granted qualified immunity."  Defs.' Br. in Supp. of (Second) Mot. for Summ. J. 8, ECF 56.  Additionally, Defendants contend that they are entitled to summary judgment on the assault and battery claims because "Defendants Quintana, Smith and Kory did not participate in the alleged use of excessive force, i.e. choking."  *Id*. at 9.

### III

Under the Local Rules of the United States District Court for the Eastern District of Michigan, "A party must obtain leave of court to file more than one motion for summary judgment." E.D. Mich. L. R. 7.1(b)(2). The Deputies did not seek, much less obtain, leave of court before filing their second motion for summary judgment. Even if they had, however, the Deputies would not be entitled to the relief that they seek.

### A

On summary judgment, whether a defendant is entitled to qualified immunity depends on a two-step inquiry: first, whether the violation of a constitutional right has occurred, and second, whether the right at issue "was clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citations and quotation marks omitted).

Here, the Deputies acknowledge that the right to be free from excessive force is clearly established. Instead, they challenge whether they themselves violated Plaintiff's constitutional rights by not preventing Sergeant Tatrai from choking Plaintiff, asserting that they "had no realistic opportunity to intervene and prevent the alleged choking of Plaintiff." Defs.' Br. 8.

### B

"To hold an officer liable for the use of excessive force," the Sixth Circuit instructs, "a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (quotation marks omitted) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Here, Plaintiff's claim against the Deputies proceeds under the third theory.

"Generally speaking," the Sixth Circuit explains, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429. "Acts of omission are actionable in this context to the same extent as are acts of commission." *Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973) (per curiam).

In this case, the Deputies do not dispute that they observed Sergeant Tatrai's actions — rather, they dispute that whether they had the ability ("the opportunity and the means") to try and stop Sergeant Tatrai. Thus, the issue is whether a reasonable juror could conclude that the Deputies had sufficient time to perceive what was happening and "intercede." *Ontha v. Rutherford Cnty., Tenn*., 222 F. App'x 498, 506 (6th Cir. 2007).

An officer is liable for not acting to prevent the use of excessive force, the Sixth Circuit cautions, only if "the underlying episode of excessive force has spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it." *Id.* (collecting cases). Unsurprisingly, the court further observes, liability has generally not attached when the "entire incident unfolds in a matter of seconds." *Id*. (quotation marks omitted) (quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 207 n.3 (1st Cir. 1990)).

In *Ontha*, for example, eyewitnesses testified that a patrol car chased down a man for six or seven seconds, "seemingly making no effort to brake or steer away before striking him." 222 F. App'x at 501. After the man died from the injuries inflicted by the patrol car, his parents brought § 1983 claims against the two police officers in the patrol car at the time. The district court concluded that neither the officer who was driving nor the officer who was a passenger was entitled to qualified immunity. *Id*. at 500. Reversing the judgment of the district court in part,

the Sixth Circuit concluded that although the driver was not entitled to qualified immunity, the

passenger was.  *Id*.  The court explained that the passenger could not be held liable because he

had no a realistic opportunity to intervene, elaborating:

> [E]ven if Deputy Emslie had announced his allegedly malevolent intentions as he
> began to accelerate the patrol car, it is doubtful that Deputy Morrow could be
> found to have had a realistic opportunity to intervene and prevent harm from
> befalling Tommy Ontha.  Within a span of a few short seconds, Deputy
> Morrow would have had to identify and employ some reasonable (and safe) means of
> dissuading or otherwise preventing Deputy Emslie from steering the patrol car
> toward a fleeing suspect.  Given the inherent dangers of interfering with the driver
> of a moving vehicle, this alone would have been a daunting task.  Yet, because
> Deputy Emslie did not announce his intentions, Deputy Morrow also would have
> been required, in this same short time span, to ascertain that his fellow deputy was
> not merely pursuing a fleeing suspect in a reasonable and appropriate fashion, but
> instead was intentionally or recklessly pursuing a course of action that was likely
> to inflict harm upon Tommy Ontha unless he interceded.  We are unwilling, under
> these circumstances, to impose upon Deputy Morrow the duty to intervene and
> protect Tommy Ontha from the excessive force that Deputy Emslie allegedly
> inflicted with the patrol car.

*Id*. at 506–07 (emphasis omitted).

In *Durham v. Nu'man*, 97 F.3d 862 (6th Cir. 1996), in contrast, the Sixth Circuit reversed

an award of summary judgment to the defendant nurse in a case where a beating "lasted

approximately ten minutes" and the defendant "watched the beating unfold on her monitor from

the nurse's station, and then from the doorway of . . . the room where the beating took place."

*Id*. at 868.  "This time period," the court concluded, "was long enough for Nurse Ahlers to have

been able to make a difference, either by directing the hospital security officers to stop their

attack, or by calling security from the main building of the hospital."  *Id*.

Somewhere between the facts of those two cases stands the decision in *Russell v. City of

Rosedale*, No. 08–13213, 2010 WL 1257339 (E.D. Mich. Mar. 30, 2010) (Hood, J.).  With

factual allegations not unlike those made by Plaintiff in this case, the plaintiff in *Russell* alleged

"that as he lay face first on the pavement with his hands underneath him, two of the Defendants

ground their knees into his back while one of the Defendants struck him from behind with a hard object that caused Plaintiff to lose consciousness.  Then Defendant McLeod gave ten knee strikes to his upper body and head.  At no time during Defendant McLeod's multiple knee strikes to Plaintiff did Defendants LaTour, Monroe, and Pfeifer make any attempt to intervene and stop McLeod's actions." *Id*. at 2.  Distinguishing *Ontha*, the court cautioned: "Certainly the infliction of ten knee strikes could not occur in a matter of six to seven seconds."  *Id*. at 7.  The Court then denied the officers' motion for summary judgment, explaining that "there is a question of fact as to whether Officers LaTour, Monroe, Pfeifer had sufficient time to implement preventative measures." *Id*.

In this case, as noted, it is undisputed that the alleged use of excessive force lasted for about six seconds.  The dispute is whether a reasonable person could conclude that these six seconds were sufficient for the Deputies to intervene.

As the Sixth Circuit noted, this presents "a close issue."  *Dixon v. Cnty. of Roscommon*, No. 11-1127, 2012 WL 1522320, at *3 (6th Cir. May 2, 2012).  A reasonable argument can be made that six seconds was simply insufficient for the Deputies to attempt to prevent the harm from occurring.[4]

The Court, however, is not called upon to decide whether a reasonable person could conclude that six seconds was not enough time for the Deputies to have been able to make a difference.  Rather, the Court must ask whether a reasonable person could conclude that six seconds was enough time for the Deputies to observe Sergeant Tatrai choking Plaintiff and intervene.  Under the circumstances, it cannot be said that no reasonable person could conclude that there was insufficient time to intervene on Plaintiff's behalf.  The deputies had time to ask

---

[4] *See generally* Malcom Gladwell, *Seven Seconds in the Bronx: The Delicate Art of Mind Reading*, *in Blink* 189–244 (Little Brown 2005) (discussing effects of extreme stress and elevated heart rate).

"You wanna play some more?  Huh?  You want to play some more?  You like playing with the police?"  Video Tr. at 9.  Had they been so inclined, they had time to tell Sergeant Tatrai "stop" and, moreover, to act to stop him.  The Deputies are not entitled to summary judgment on Plaintiff's § 1983 claim.

C

Finally, the Deputies renew their contention that they are entitled to summary judgment on Plaintiffs assault and battery claims.  With remarkable economy of words, the Deputies tersely assert: "Defendants' actions did not constitute assault and battery for the same reasons outlined in [the above § 1983 argument]."  Defs.' Br. 9.

As this Court explained in its previous order, however, "a reasonable jury could conclude that the level of force used by the deputies was excessive.  In such circumstances, a police officer can be held liable for assault and battery."  *Dixon v. Cnty. of Roscommon*, No. 09–14236, 2011 WL 281042, at *11 (E.D. Mich. Jan. 25, 2011).  The Sixth Circuit affirmed the judgment of this Court.  *Dixon v. Cnty. of Roscommon*, No. 11-1127, 2012 WL 1522320 (6th Cir. May 2, 2012) (per curiam)

"Generally, the law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not."  *United States v. Gibbs*, 626 F.3d 344, 351 (6th Cir. 2010) (internal quotation marks omitted) (quoting *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997)).  That is, "A party who could have sought review of an issue or a ruling during a prior appeal is deemed to have waived the right to challenge that decision thereafter."  *Adesida*, 129 F.3d at 850.

On appeal to the Sixth Circuit in this case, the Deputies did not challenge this Court's determination that the Deputies could be found to have used an objectively unreasonable degree

of force.  Rather, the Sixth Circuit noted, the "only disputed factor in this case is good faith, a subjective test under which a defendant is subject to liability only if he acted with malicious intent.  The defendants argue that the district court erroneously relied on its determination that the deputies could be found to have used an objectively unreasonable degree of force to hold that they could also be found to have acted in bad faith."  *Dixon*, 2012 WL 1522320, at *3 (quotation marks and citations omitted) (quoting *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 229 (Mich. 2008)).

Affirming this Court's judgment, the Sixth Circuit explained that "parts of the record support an inference of malice, including statements made by the deputies during the incident, such as, 'You wanna play some more?  Huh?  You want to play some more?  You like playing with the police?' and, 'Come on stupid, let's go.'  Additionally, when Quintana is explaining the situation to Tatrai and Smith, one of them asks, 'Are you gonna fuck with him now?' at which point Quintana appears to turn off the audio recording device."  *Dixon*, 2012 WL 1522320, at *3 (citations omitted) (citing *Odom*, 760 N.W.2d at 229).

Because the Deputies did not challenge this Court's determination that the Deputies could be found to have used an objectively unreasonable degree of force, they have waived their right to raise a challenge to it now.  Even if they had not, moreover, Defendants would not be entitled to summary judgment on Plaintiff's assault and battery claim as they have offered no arguments why this Court's previous conclusion should be reversed.

**IV**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 56) is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 18, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 18, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS